No. 25-1573

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

STATE OF MICHIGAN,

     Plaintiff-Appellant,

v.

BRIAN WILLIAM KEELY,

     Defendant-Appellee.

Appeal from the United States District Court
Western District of Michigan, Southern Division
Honorable Chief Judge Hala Y. Jarbou

**BRIEF FOR PLAINTIFF-APPELLANT**

Dana Nessel
Attorney General

Ann M. Sherman
Solicitor General

John S. Pallas
Assistant Attorney General
Co-Counsel of Record
Attorneys for Plaintiff-Appellant
Department of the Michigan
Attorney General
Criminal Appellate and Parole
Appeals Division
525 W. Ottawa St.
P.O. Box 30217
Lansing, MI 48909
(517) 335-7650

Dated: September 30, 2025

## CORPORATE DISCLOSURE

State government and state agencies are excepted from filing a corporate affiliate/financial interest disclosure statement.

i

# TABLE OF CONTENTS

Page

Corporate Disclosure ...................................................................................i

Table of Contents ......................................................................................ii

Table of Authorities...................................................................................iv

Statement in Support of Oral Argument...................................................ix

Jurisdictional Statement............................................................................1

Statement of Issues Presented...................................................................3

Introduction...............................................................................................4

Statement of the Case ...............................................................................5

      A.     Keely is charged with second-degree murder and
             involuntary manslaughter in state court .............................5

      B.     The district court's decision to remove this matter from
             state court..........................................................................6

      C.     The district court's decision denying the State's motion
             to remand ...........................................................................8

      D.     The district court's decision that Keely was entitled to
             Supremacy Clause immunity, and therefore to
             dismissal of the charges against him.....................................9

Standard of Review .................................................................................10

Summary of Argument.............................................................................11

Argument.................................................................................................12

I.    Removal of this state criminal prosecution to federal court
     was erroneous where Keely was not a federal officer or
     acting under one at the time state criminal charges were

brought or when the notice of removal was filed.  Moreover, Keely was not a federal officer or acting under one on the date he killed Samuel Sterling ...................................................... 12

    A.    Keely was not a federal officer or working under one at the time state criminal charges were brought against him or at the time he filed a notice of removal ................... 14

    B.    Keely was not a federal officer at the time he killed Samuel Sterling ................................................................. 25

    C.    Keely was not acting "under" a federal officer at the time he killed Samuel Sterling ............................................. 32

II.    The district court erred in finding that Keely was entitled to Supremacy Clause immunity where Keely was not authorized by the federal government to act in the manner he did and, in any event, because he did more than was necessary and proper in carrying out any duties ......................... 37

    A.    Authorized acts ................................................................ 39

    B.    Necessary and proper ...................................................... 47

Conclusion and Relief Requested ........................................................... 58

Certificate of Compliance ...................................................................... 59

Certificate of Service ............................................................................. 60

Designation of Relevant District Court Documents .............................. 61

iii

# TABLE OF AUTHORITIES

Page

**Cases**

*Abernathy v. Kral,*
779 F.App'x 304 (6th Cir. 2019) ........................................................... 14

*Arizona v. Manypenny,*
451 U.S. 232 (1981) ..................................................................... 12, 24

*Baucom v. Martin,*
677 F.2d 1346 (11th Cir. 1982) ........................................................ 40

*Bivens v. Six Unknown Named Agents of Federal Bureau of
Narcotics,*
403 U.S. 388 (1981) ............................................................................ 29

*Cameron v. Johnson,*
390 U.S. 611 (1968) ............................................................................ 12

*Chmiel v. Beverly Wilshire Hotel Co.,*
873 F.2d 1283 (9th Cir. 1989) .......................................................... 10

*Clifton v. Cox,*
549 F.2d 722 (9th Cir. 1977) ............................................................. 55

*Colorado v. Symes,*
286 U.S. 510 (1932) ............................................................................ 57

*Cunningham v. Neagle,*
135 U.S. 1 (1890) ......................................................................... 37, 38

*Dixon v. Georgia Indigent Legal Services, Inc.,*
388 F.Supp. 1156 (S.D. Ga. 1974) .................................................... 14

*Douglas v. City of Jeannette,*
319 U.S. 157 (1943) ............................................................................ 12

*Eastman v. Marine Mech. Corp.,*
438 F.3d 544 (6th Cir. 2006) ............................................................. 13

*Georgia v. Meadows,*
  88 F.4th 1331 (11th Cir. 2023) ..................................................... passim

*Good v. Armstrong World Industries, Inc.,*
  914 F. Supp. 1125 (E.D. Pa. 1996) ..................................................... 34

*Government of Puerto Rico v. Express Scripts, Inc.,*
  119 F.4th 174 (1st Cir. 2024) ........................................................... 33

*Graham v. Connor,*
  490 U.S. 386 (1989) .......................................................................... 48

*Harnden v. Jayco, Inc,*
  496 F.3d 579 (6th Cir. 2007) ........................................................... 13

*Herr v. U.S. Forest Serv.,*
  803 F.3d 809 (6th Cir. 2015) ........................................................... 12

*Hudak v. Elmcroft of Sagamore Hills,*
  58 F.4th 845 (6th Cir. 2023) ........................................................... 14

*Huffman v. Pursue, Ltd.,*
  420 U.S. 592 (1975) .......................................................................... 12

*Idaho v. Horiuchi,*
  215 F.3d 986 (9th Cir. 2000), 253 F.3d 359 (9th Cir. 2001) (en
  banc), vacated as moot, 266 F.3d 979 (9th Cir. 2001) ........................ 48

*In re Gillis,*
  512 N.W.2d 79 (Mich. Ct. App. 1994) ................................................ 41

*Kentucky v. Long,*
  837 F.2d 727 (6th Cir. 1988) ...................................................... 38, 47

*King v. Handorf,*
  821 F.3d 650 (5th Cir. 2016) ........................................................... 18

*LaLonde v. County of Riverside,*
  204 F.3d 947 (9th Cir. 2000) ........................................................... 48

*Maryland v. Soper,*
  270 U.S. 9 (1926) .............................................................................. 22

v

*Mays v. City of Flint,*
871 F.3d 437 (6th Cir. 2017) ....................................................... 13, 33

*Mesa v. California,*
489 U.S. 121 (1989) ........................................................... 14, 22, 36

*New York v. Tanella,*
374 F.3d 141 (2d Cir. 2004) .............................................................. 47

*North Carolina v. Cisneros,*
947 F.2d 1135 (4th Cir. 1991) ..................................................... 55, 56

*Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.,*
647 F.App'x 619 (6th Cir. 2016) ...................................................... 34

*Ohio v. Meade,* No. 2:21-cv-5587,
2022 WL 486294 (S.D. Ohio Feb. 17, 2022) ........................................ 29

*People v. Albers,*
672 N.W.2d 336 (Mich. Ct. App. 2003) .............................................. 41

*People v. Datema,*
533 N.W.2d 272 (Mich. 1995) ........................................................... 42

*People v. Werner,*
659 N.W.2d 688 (Mich. Ct. App. 2002) .............................................. 40

*Public Interest Legal Foundation v. Benson,*
136 F.4th 613 (6th Cir. 2025) ........................................................... 28

*Robinson v. Sauls,*
102 F.4th 1337 (11th Cir. 2024) .................................................. 28, 29

*Steel Co. v. Citizens for a Better Env't,*
523 U.S. 83 (1998) ........................................................................... 12

*Tennessee v. Davis,*
100 U.S. 257 (1879) ......................................................................... 37

*Texas v. Kleinert,*
855 F.3d 305 (5th Cir. 2017) ....................................................... 23, 27

*United States v. Tucker,*
    28 F.3d 1420 (6th Cir. 1994) ................................................................ 18

*Vandeventer v. Guimond,*
    494 F.Supp.2d 1255 (D.Kan. 2007) ..................................................... 30

*Watson v. Phillip Morris Cos.,*
    551 U.S. 142 (2007) ...................................................................... 13, 33

*Whitehead v. Senkowski,*
    943 F.2d 230 (2d Cir. 1991) ................................................................ 39

*Wisconsin Dep't of Corr. v. Schacht,*
    524 U.S. 381 (1998) ............................................................................ 18

*Wright v. Spaulding,*
    939 F.3d 695 (6th Cir. 2019) .............................................................. 17

*Wyoming v. Livingston,*
    443 F.3d 1211 (10th Cir. 2006) ........................................................... 10

## Statutes

1 U.S.C. §1 ................................................................................................ 26

28 U.S.C. § 1442 ...................................................................................... 26

28 U.S.C. § 1442(a) .................................................................................. 14

28 U.S.C. § 1442(a)(1) ...................................................................... passim

28 U.S.C. § 1291 ........................................................................................ 1

28 U.S.C. § 1446 ...................................................................................... 26

## Other Authorities

Mannheimer, Michael, *Unpacking Supremacy Clause Immunity*
    (June 06, 2025) ................................................................................. 38

**Rules**

Fed R. App P. 3(c)(4)................................................................................1

Fed. R. App. P. 28(a)(4) .........................................................................1

Fed. R. App. P. 3...................................................................................1

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

This case involves significant issues of comity, federalism, and the overall delicate balance between federal and state law. In particular, this case involves removal of a state criminal case to federal court under 28 U.S.C. § 1442(a)(1). Removal under this statute is rare and, as such, there is relatively little case law in this Circuit concerning the process of removal. Similarly, there is scarce case law in this Circuit concerning Supremacy Clause immunity, which ultimately led to the dismissal of the state criminal charges in this case. The State asserts both that removal was improper and that, even if it was not, Defendant Brian Keely was not entitled to Supremacy Clause immunity and dismissal of the charges against him. Given the state of the law in this Circuit concerning these issues and the potential for future/further misapplication of the removal statutes and Supremacy Clause immunity, the State respectfully requests that this Court conduct oral argument in this important case.

## JURISDICTIONAL STATEMENT

This is the State's jurisdictional statement pursuant to Fed. R. App. P. 28(a)(4).

The basis of the district court's jurisdiction in this matter was its finding that removal from state court pursuant to 28 U.S.C. § 1442(a)(1) (federal officer removal) was appropriate. The basis of *this* Court's jurisdiction is 28 U.S.C. § 1291, which permits appeals from all final decisions of the district courts of the United States. A timely notice of appeal was filed in this case on June 23, 2025. (6/23/25 Notice of Appeal, Case#No.1:24-cr-115, ECF#112, PageID.1585.)

This appeal is taken from the final opinion/order/judgment in this case, entered on May 28, 2025, that dispose of all of the parties' claims and dismisses the criminal charges against Keely in their entirety.[1] (5/28/25 Opinion, Case#1:24-cr-115, ECF#109, PageID.1564−82; 5/28/25

---

[1] Under the so-called "merger" doctrine, laid out in Fed R. App P. 3(c)(4), the Notice of Appeal in this case "encompasses all orders that, for purposes of appeal, merge into the designated judgment or appealable order" and, consequently, "[i]t is not necessary to designate those orders in the notice of appeal." *See also* Fed. R. App. P. 3 advisory committee's note to the 2021 amendment ("The general merger rule can be stated simply: an appeal from a final judgment permits review of all rulings that led up to the judgment.")

Order, Case#1:24-cr-115, ECF#110, PageID.1583; 5/28/25 Judgment,

Case#1:24-cr-115, ECF#, PageID.1584).

## STATEMENT OF ISSUES PRESENTED

1.    Based on persuasive authority from the Eleventh Circuit, removal of a state criminal case to federal court should only be appropriate where the defendant is *still* a federal officer or *still* acting under a federal officer at either the time that state charges are brought against him or when a removal notice is filed.  Keely was not functioning as a federal officer or acting under a federal officer either at the time that the state charges were filed against him or when the notice of removal was filed.  Did the district court err in denying the State's motion to remand for lack of subject matter jurisdiction?

2.    Removal of a state criminal case to federal court is traditionally only appropriate when the defendant has demonstrated that he was a federal officer or acting under a federal officer at the time of the conduct at issue.  Keely failed to make this showing below where he was a member of a federal/state law enforcement task force, but where he remained employed by the Michigan State Police and accountable to his state employer for his conduct.  Did the district court err in granting removal of this case from state court?

3.    Based on authority from this Circuit, Supremacy Clause immunity should only be granted where it has been demonstrated that (1) the federal agent was performing an act that he was authorized to do by the law of the United States and (2) in performing that authorized act, the federal agent did no more than what was necessary and proper for him to do.  Keely was not authorized to commit the acts at issue and he did more than what was necessary and proper for him to do.  Did the district court err in granting Supremacy Clause immunity to Keely and dismissing the criminal charges against him?

## INTRODUCTION

On April 17, 2024, a joint federal/state law enforcement task force tried to arrest Samuel Sterling on outstanding Michigan state warrants.  Sterling tried to flee from the officers on foot.  However, Det./Sgt. Brian Keely, a state law enforcement member of the task force, used the vehicle he was driving to hit Sterling and ultimately pin him against the brick wall of a restaurant.  Sterling died from the injuries he sustained.  A little over a month later, the Michigan Attorney General brought charges under Michigan law of second-degree murder and involuntary manslaughter against Keely.

But this case did not proceed as state criminal cases usually do. Instead, Keely attempted to remove the case to federal court claiming that he was a federal officer (or acting under one) at the time he committed the actions that led to Sterling's tragic death.  The district court[2] granted that request and then would not remand the matter to state court when presented with persuasive Eleventh Circuit authority

---

[2] In order to avoid confusion, when the State refers to "the district court," it is referring to the federal district court below.  When it refers to the "state district court," the State is referring to the state court that conducted a preliminary examination on the charges against Keely and bound the matter over to the state circuit court.

standing for the proposition that federal officer removal does not apply to those who were *former* federal officers at the time charges are brought or a notice of removal is filed.  Subsequently, the district court dismissed the charges against Keely finding that he was entitled to Supremacy Clause immunity for his actions.

Keely's case should not have been removed to federal in the first place.  But, even if removal was proper, the district court subsequently erred in dismissing the case against Keely based on Supremacy Clause immunity.

Reversal is warranted.

## STATEMENT OF THE CASE

### A.   Keely is charged with second-degree murder and involuntary manslaughter in state court

The basic facts of this case were outlined by the district court early in the proceedings:[3]

---

[3] When the notice of removal was filed in the district court, the case was assigned a civil case number – 1:24-cv-672.  Once the district court formally removed the case from state court to federal court, the case was assigned a criminal case number – 1:24-cr-115.  The State will indicate in its citations to the record when page ID #s refer to matters held or filed in the civil case versus when they refer to matters held or filed in the subsequent criminal case.

Defendant Brian Keely was a detective sergeant with the Michigan State Police ("MSP") assigned to a regional task force created by the United States Marshal Services ("USMS"). On April 17, 2024, Keely and other members of that task force were attempting to apprehend Samuel Da Jon Cornelius Sterling under multiple warrants for his arrest. As Sterling fled on foot, Keely pursued him in his vehicle. While Sterling was running along the exterior wall of a Burger King restaurant, Keely drove his vehicle toward Sterling in order to block his escape. The vehicle struck Sterling and pinned him against the brick wall. Sterling died from his injuries.

In May 2024, the Michigan Attorney General filed a felony complaint against Keely in state court, charging him with second-degree murder and involuntary manslaughter for the death of Sterling. (Felony Compl., ECF No. 1-1, Page ID.28)

(8/26/24 Opinion, Case #1:24-cv-672, ECF#18, PageID.196−97.)

## B.     The district court's decision to remove this matter from state court

Keely filed a notice of removal in the district court on June 28, 2024. (6/28/24 Notice of Removal, Case#1:24-cv-672, ECF#1, PageID.1−21.) The district court ultimately issued an order stating that it needed to conduct an evidentiary hearing to determine whether removal was proper. (8/6/24 Order, Case#1:24-cv-672, ECF#12, PageID.185-186.)

In the meantime, on August 12, 2024, the state district court conducted a preliminary examination pursuant to state law on the charges against Keely. (8/12/24 Tr., Case#1:24-cr-115. ECF #38, PageID.210−378.)

The evidentiary hearing on Keely's notice of removal was held in the district court on August 21, 2024. (8/21/24 Tr., Case#1:24-cv-672, ECF#21, PageID.212−334.)

On August 22, 2024, the state district court bound the matter over to the state circuit court finding there to be probable cause that Keely committed the state criminal offenses of second-degree murder and involuntary manslaughter. (8/22/24 Tr., Case#1:24-cr-115, ECF#39, PageID.383−86.)

On August 26, 2024, the district court issued an opinion holding that "the Court will accept removal of the case to federal court under § 1442 and order the state court to proceed no further." (8/26/24 Opinion, Case#1:24-cv-672, ECF#18, PageID.209.) The district court reasoned that Keely was either a federal officer at the time of the Sterling's death or that he was acting under a federal officer at that time. (*Id.* at PageID.202−05.) At that point, the case was reassigned a

7

federal criminal docket number.  (8/27/24 Notice, Case#1:24-cv-672, ECF#20, PageID.211.)

### C.    The district court's decision denying the State's motion to remand

On September 10, 2024, the State filed a motion to remand to state court for lack of subject matter jurisdiction in the district court, relying on the Eleventh Circuit's decision in *Georgia v. Meadows*, 88 F.4th 1331 (11th Cir. 2023), cert denied 145 S.Ct. 545 (2024), which held that *former* federal officers are not entitled to removal of state court criminal cases against them.  (9/10/24 Motion/Brief, Case#1:24-cr-115, ECF#8, PageID.16−31.)  On October 17, 2024, the State filed a motion for an evidentiary hearing on its motion to remand.  (10/17/24 Motion/Brief, Case#1:24-cr-115, ECF #33, PageID.165−71.)  Initially, the district court scheduled a hearing on the State's motion to remand. (11/12/24 Notice, Case#1:24-cr-115, ECF#37, PageID.209.) Subsequently, however, the district court cancelled that hearing. 12/2/24 Tr., (Case#1:24-cr-115, ECF#45, PageID.473.)

The federal district court then issued an opinion denying the State's motion to remand and its motion for evidentiary hearing.

(12/11/24 Opinion, Case#1:24-cr-115, ECF#51, PageID.494−502.)  The district court held that it was "not persuaded that it should extend the holding in *Meadows* to persons *acting* under a federal officer."  (*Id.* at PageID.498; emphasis added.)

### D.   The district court's decision that Keely was entitled to Supremacy Clause immunity and, therefore, to dismissal of the charges against him

In the meantime, Keely filed a motion to dismiss the charges against him based on Supremacy Clause immunity.  (10/29/24 Motion/Memorandum, Case#1:24-cr-115, ECF#s36/36-1, PageID.181−82, 186−200).  The State filed a response in opposition to the motion to dismiss.  (11/22/24 Answer/Brief, Case#1:24-cr-115, ECF#43, PageID.438−68.)  The district court scheduled an evidentiary hearing on Keely's motion to dismiss for April 21, 2025.  (2/25/25 Notice, Case#1:24-cr-115. ECF#62, PageID.541.)

The evidentiary hearing on Keely's motion to dismiss was held on April 21, 2025.  (4/21/25 Tr., Case#1:24-cr-115, ECF#103, Page PageID.1077−1381.)  Closing arguments were made at the conclusion of the hearing on April 22, 2025.  (4/21/25 Tr., Case#1:24-cr-115, ECF#104, PageID.1392−1441.)  The district court ordered further briefing, with

9

the parties asked to file simultaneous briefs on May 13, 2025. (*Id.* at 1443.)

The district court issued an opinion finding that Keely was entitled to Supremacy Clause immunity and dismissal of the charges against him on May 28, 2025. (5/28/25 Opinion, Case#1:24-cr-115, ECF#109, PageID.1564−82.) An order (5/28/25 Order, Case#1:24-cr-115, ECF#110, PageID.1583) and a judgment (5/28/25 Judgment, Case#1:24-cr-115, ECF#111, PageID.1584) followed.

The State filed a timely notice of appeal on June 23, 2025. (6/23/25 Notice of Appeal, Case#1:24-cr-115, ECF#112, PageID.1585.)

## STANDARD OF REVIEW

The denial of a request to remand an action to state court for lack of removal jurisdiction is reviewed de novo. *Chmiel v. Beverly Wilshire Hotel Co.,* 873 F.2d 1283, 1285 (9th Cir. 1989). Similarly, "Supremacy Clause immunity dismissals present a mixed question of law and fact and are reviewed de novo." *Wyoming v. Livingston*, 443 F.3d 1211, 1226 (10th Cir. 2006) (internal citation omitted).

## SUMMARY OF ARGUMENT

The State charged defendant Brian Keely in state court with second-degree murder and involuntary manslaughter. Keely moved to have the case removed to federal court claiming that, at the time he killed Samuel Sterling, he was a "federal officer" or "acting under" one. The district court erroneously granted that request because Keely was no longer a federal officer or acting under one when the State brought charges or when Keely moved for removal. In any event, Keely was neither a federal officer nor acting under one at the time of the incident leading to Sterling's death. Finally, the district court erred in granting dismissal of the charges against him Keely based on Supremacy Clause immunity where there was at least a genuine factual dispute concerning whether Keely was performing authorized acts at the time of Sterling's killing or doing only what was necessary and proper in carrying out any authorized acts.

This Court should reverse and/or remand this case.

11

## ARGUMENT

I. **Removal of this state criminal prosecution to federal court was erroneous where Keely was not a federal officer or acting under one at the time state criminal charges were brought or when the notice of removal was filed. Moreover, Keely was not a federal officer or acting under one on the date he killed Samuel Sterling**

A court only has subject matter jurisdiction over a case where it has the "statutory or constitutional *power* to adjudicate the case." *Herr v. U.S. Forest Serv.*, 803 F.3d 809, 813 (6th Cir. 2015) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)). "In the absence of subject-matter jurisdiction, a federal court must dismiss the lawsuit—no matter how far the litigation has progressed …, no matter whether the parties forfeited the issue, no matter indeed whether the parties have waived it." *Herr*, 803 F.3d at 813−14.

"[A] federal district court should be slow to act 'where its powers are invoked to interfere by injunction with threatened criminal prosecutions in a state court.' " *Cameron v. Johnson*, 390 U.S. 611, 618 (1968) (quoting *Douglas v. City of Jeannette*, 319 U.S. 157, 162 (1943)). There is a "strong judicial policy against federal interference with state criminal proceedings." *Arizona v. Manypenny*, 451 U.S. 232, 243 (1981) (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 600 (1975)).

12

A limited exception to this policy is the federal officer removal statute, which Keely and the district court relied upon in this case. The federal officer removal statute states that a district court "may" remove "a criminal prosecution . . . against . . . any officer (or any person acting under that officer) of the United States . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1).

The party seeking removal has the burden of establishing federal jurisdiction by a preponderance of the evidence. *Eastman v. Marine Mech. Corp.*, 438 F.3d 544, 549 (6th Cir. 2006). Typically, removal statutes are strictly construed, and "all doubts should be resolved against removal." *Harnden v. Jayco, Inc*, 496 F.3d 579, 581 (6th Cir. 2007). *See also Mays v. City of Flint*, 871 F.3d 437, 442 (6th Cir. 2017). While it has been held that the federal officer removal statute is different in that it should be "liberally construed," even a liberal construction has its limits. *See Watson v. Phillip Morris Cos.*, 551 U.S. 142, 147 (2007). In other words, while the federal officer removal statute is to be liberally construed, it must nevertheless be interpreted "with the highest regard for the right of the states to make and enforce their own laws in the field belonging to them under the Constitution."

13

*Dixon v. Georgia Indigent Legal Services, Inc.*, 388 F.Supp. 1156, 1162 (S.D. Ga. 1974).

Federal courts only have subject-matter jurisdiction over cases that have been *properly* removed under § 1442(a)(1). *See Hudak v. Elmcroft of Sagamore Hills*, 58 F.4th 845, 859 (6th Cir. 2023) (citing *Mesa v. California*, 489 U.S. 121, 136 (1989)). For the reasons discussed below, this case was not properly removed.

In order to qualify for removal under 28 U.S.C. § 1442(a)(1), the moving party needs to show: (1) he was an "officer, or any person acting under that officer, of the United States"; (2) he is sued/charged criminally "for or relating to any act under color of such office"; and (3) a "colorable federal defense." *Mesa v. California,* 489 U.S. at 129 (quoting 28 U.S.C. § 1442(a)); *Abernathy v. Kral*, 779 F.App'x 304, 307 (6th Cir. 2019).

### A. Keely was not a federal officer or working under one at the time state criminal charges were brought against him or at the time he filed a notice of removal

In *Georgia v. Meadows*, 88 F.4th 1331 (11th Cir. 2023), cert denied 145 S.Ct. 545 (2024), the Eleventh Circuit Court of Appeals carefully analyzed the text of 28 U.S.C. § 1442(a)(1) and held that it did not apply

14

to *former* federal officers, irrespective of whether the defendant was a federal officer *at the time* of his charged conduct.  88 F.4th at 1338−43.  In so finding, the Court noted the variation in language between subsections (a) and (b) of § 1442, with subsection (a) being silent as to applicability to former officers, and subsection (b) specifically referencing removal of actions commenced against *former* officers.  *Meadows*, 88 F.4th at 1338−42.  When the Supreme Court had the opportunity to weigh on *Meadows'* interpretation of the federal officer removal statutes, it declined to do so.

The Court supported its holding as follows:

Our interpretation of a statute must begin with the language of the statute itself.  The text of section 1442(a)(1) applies to only current officers.  It is silent on the removal of a prosecution commenced against a *former* officer of the United States.  The ordinary meaning of "officer" does not include "former officer."  And the ordinary meaning usually controls.

The whole text of section 1442 reinforces the ordinary meaning of subsection (a)(1).  Indeed, in contrast to the silence in subsection (a)(1), subsection (b) expressly provides for the removal of actions commenced against a former officer.  Section 1442(b) grants a right of removal to a person "who is or at *the time the alleged action accrued was*, a civil officer of the United States."  28 U.S.C. § 1142(b) (emphasis added).  This variation in language connotes a difference in meaning:  when Congress includes particular language in one section of a statute but omits it in another section of the

15

same Act, it is generally presumed that Congress acts intentionally.

The presumption that Congress intentionally omitted any reference to former officers applies with particular force to this statute. The provisions containing disparate language are in close proximity to each other and address the same subject matter. The explicit reference to former officers, in an adjacent section that also addresses removal jurisdiction, suggests that section 1442(a)(1) does not apply to former officers.

To be sure, the term "officer" may sometimes include former officers. But that interpretation must be supported by compelling textual evidence and the statutory context must make clear that Congress intended the broader meaning.

\*\*\*

The syntax of section 1442(a) does not suggest that removal depends on the *singular* condition that the defendant held office at the time of his charged conduct. Instead, the statute prescribes *multiple* independent conditions for removal: first, the defendant must be "any officer … of the United States," and second, the suit he seeks to remove must be "for or relating to any act under color of such office." 28 U.S.C. § 1142(a)(1). Although the secondary condition of section 1442(a)(1)—that the officer's act relate to his federal office—limits the class of officers eligible for removal, that condition does not expand the scope of the first condition beyond its ordinary meaning. The requirement that a defendant be a current "officer … of the United States" stands as an independent prerequisite for removal. *See* 28 U.S.C. § 1442(a)(1).

\*\*\*

Earlier versions of section 1442(a)(1) also evidence that when Congress intended to permit removal by former officers, it expressed that intent with clear language. The

16

1911 codification of the removal provision used nearly identical language and was also silent as to former officers. But the same section of the 1911 statute permitted removal by former officers of another class: Congress used temporal language to allow the removal of "any suit … commenced against any person for [or] on account of anything done by him *while an officer of either House of Congress* in the discharge of his official duty." The temporal language in the congressional-officer provision supports the view that the contrasting silence in the federal-officer provision, within the same section of the same statute, controls its interpretation.

*Meadows*, 88 F.4th at 1338−1342 (cleaned up).

The State recognizes that a holding of the Eleventh Circuit Court of Appeals is not binding on this Court. *See Wright v. Spaulding*, 939 F.3d 695, 699 (6th Cir. 2019) (reiterating the principle that holdings of other circuit courts of appeal are not binding on courts in this Court). But there *is* no binding or mandatory authority out of this Court on this precise issue. As such, in the absence of binding or mandatory authority from this Circuit, federal courts within this Circuit are free to turn to persuasive authority, such as decisions of other circuits.[4] *See*

---

[4] The district court conceded that this Court has not "directly addressed" the issue raised in *Meadows* but said that this Court has – in the past – "look[ed] to the time of the challenged act" to make a determination whether an actor was a federal officer or working under a federal officer under § 1442(a)(1). (12/11/24 Opinion, Case#1:24-cr-115, ECF#51, PageID.498.)

*King v. Handorf*, 821 F.3d 650, 655 (5th Cir. 2016) (illustrating the general principle that courts may turn to persuasive authority in the absence of mandatory authority); *United States v. Tucker*, 28 F.3d 1420, 1425 (6th Cir. 1994) (looking to other circuits).  As such, this Court can – and should – adopt the very well-reasoned conclusion of the Eleventh Circuit Court of Appeals in *Meadows* that federal-officer removal under § 1442(a)(1) *only* applies to officers who remain in federal service.[5]

*Meadows* itself is silent on the exact point in time at which it should be determined whether a person has become a former federal officer.  There are several possible points in time—the point at which state court proceedings against the defendant are initiated or the point at which removal proceedings are initiated.  As the Supreme Court has itself suggested when addressing a different type of removal – the person's status should be determined at the time state proceedings are initiated. *Wisconsin Dep't of Corr. v. Schacht*¸ 524 U.S. 381, 390 (1998).

Here, the Michigan State Police suspended Keely on April 18, 2024, only one day after he killed Samual Sterling.  (4/18/25 Letter,

---

[5] While the *Meadows* Court acknowledged the uniqueness of its holding, it remained confident in its holding.  *See Meadows*, 88 F.4th at 1342.

18

Case#1:24-cr-115, ECF#30, PageID.161.)  In a letter sent to Keely on that date, the Michigan State Police informed him that the "suspension is based [on] the reasonable belief that you have committed a felony." (*Id.*)  Most importantly, the letter told Keely that he was "relieved of all police authority and are directed not to engage in any enforcement actions during this period of suspension." (*Id.*)  Clearly, Keely could no longer serve on a joint federal/state task force if he was relieved of all police authority and directed by his own agency not to engage in any enforcement actions.

The State initiated criminal charges against Keely on May 28, 2024.  (5/28/24 Complaint – Felony, Case#1:24-cr-115, ECF#8-2, PageID.34.)  Keely filed his notice of removal on June 28, 2024.  (6/28/24 Notice of Removal, Case#1:24-cv-672, ECF#1, PageID.1−21.)  Keely was still suspended from police work as of both of these dates and therefore could no longer serve as a member of a federal/state joint task force.[6]

---

[6] As recognized by the district court, there was also some question as to when Keely formally retired from the Michigan State Police.  (12/11/24 Opinion, Case#1:24-cr-115, ECF#51, PageID.495-96.)  Clearly if Keely was retired from the Michigan State Police at either the time state charges were brought or when he sought removal, he was also not entitled to federal officer removal.  Originally, at the request of the State, the district court scheduled an evidentiary hearing to resolve this

Consequently, under *Meadows*, he was not entitled to federal officer removal.

One additional point. As is discussed, *infra¸* the district court in granting removal found not only that Keely was a "federal officer" at the time of the incident at issue in this case but alternatively found that Keely was also a "person acting under [an] officer." The district court used this alternative finding to distinguish *Meadows*, even were it correctly decided.[7]

Granted, *Meadows* only specifically addresses the plain meaning of the word "officer" in § 1442(a)(1). It does not directly address the

---

question, but it ultimately cancelled that hearing as unnecessary "because Plaintiff's motion [to remand] is meritless regardless of the timing of Defendant's retirement (or suspension)." (*Id.* at PageID.496.) If this Court adopts the rule of *Meadows* and rules in favor of the State on this claim, it could – in lieu of outright reversal – remand this case to the district court for the evidentiary hearing on Keely's status that the State had asked for.

[7] The district court reasoned as follows: "*Meadows* focuses solely on the meaning of 'officer of the United States.' It does not discuss the 'acting under' language, so it provides no insight into how to interpret it. The removal statute clearly applies to federal officers 'or' to persons acting under them. Defendant does not have to be both. Consequently, even if the holding in *Meadows* is correct, it does not control the outcome here because Defendant can rely on the 'acting under' provision whether or not he was an officer of the United States after the incident involving Sterling." (12/11/24 Opinion, Case#1:24-cr-115, ECF#51, PageID.497.)

20

phrase "or any person acting under that officer" in the subsection. However, contrary to the district court's finding, *Meadows*' reasoning and rationale apply with equal force to the latter phrase for the following reasons.[8]

First, as discussed above, the *Meadows* Court said that its conclusion that former officers were excluded from the sphere of § 1442(a)(1) was reinforced by a reading of *the entirety* of § 1442. *Meadows*, 88 F.4th at 1339. In analyzing the entirety of the section, the Court concluded that there is "no indicia from text or structure suggest[ing] that section 1442(a)(1) covers former officers." *Id*. By the same token, there is no indicia from the section's text or structure that the phrase "any person acting under that officer" covers persons *formerly* acting under a federal officer.

---

[8] The district court disagreed citing a number of district court decisions declining to extend *Meadows* to the "acting under" context, most of which arose out of the Eastern District of Louisiana. (12/11/24 Opinion, Case#1:24-cr-115, ECF#51, PageID.498.) As the district court noted, "these courts note that the term 'any person' is broader than 'officer'; it refers to all individuals, including those that happen to be former officers." (*Id*.) The courts that have so-ruled are incorrect, for the reasons discussed, *infra*.

Second, *Meadows* rejects the notion that § 1442(a)(1) focuses on the officer's conduct, and specifically *when* it occurred. *Id.* at 1339–40. Instead, *Meadows* explains that § 1442(a)(1) has two independent conditions: (1) the defendant *is* an officer (status), and (2) he seeks to remove a suit related to "any act under color of office" (conduct). *Id.* at 1340. *Meadows* states that the officer's act related to his federal office does not expand his status as a federal officer, and "[t]he requirement that a defendant be a current officer of the United States stands as an independent prerequisite for removal." *Id.* (alterations omitted). By the same token, the person's status as "acting under a federal officer" is not impacted by the conduct at issue—particularly, *when* it occurred. In other words, under *Meadows*, the person's status and the person's conduct are *separate* requirements under § 1442(a)(1).

Third, the *Meadows* Court's discussion of several Supreme Court decisions – specifically *Mesa v. California, supra,* and *Maryland v. Soper*, 270 U.S. 9 (1926) – applies equally to those who have acted "under" federal officers. In that discussion, the *Meadows* Court noted, in both the *Mesa* and *Soper* cases, the defendants seeking removal in those cases *remained* federal officers/employees throughout the

22

litigation. *Meadows*, 88 F.4th at 1341. Even in a case relied upon by the district court – *Texas v. Kleinert*, 855 F.3d 305, 312 (5th Cir. 2017) – it appears that the officer seeking removal *continued* to be an officer throughout the federal removal proceedings because the court used the present tense in referring to his status ("Kleinert *is* a federal officer, and our review of the record confirms his federal-officer status.") (Emphasis added.)

Fourth, *Meadows'* finding that the purpose of § 1442(a)(1) is served by protecting only *current* federal officers applies equally to persons that are *still* acting under federal officers. The *Meadows* Court explained that the purpose of the federal officer removal statute is to protect the federal government from interference in its operations from the States. In other words, the statute prevents States from hauling federal officers into state court, which would hinder those officers' efforts to carry out their federally mandated duties. *Meadows*, 88 F.4th at 1342−43. So, if a person is *still acting* under a federal officer at the time removal is sought or when state criminal proceedings are initiated against a person, the concern with interference with federally mandated duties continues to exist. By contrast, as is the situation in this case, if

the person is no longer acting under a federal officer, that concern simply *does not exist*.

At bottom, this Court should apply *Meadows*, though not precedentially binding, to this case as that Court correctly interprets § 1442(a)(1) as applying to only current federal officers (and by implication, only those who *continue* to serve under a federal officer). *Meadows* is not just correct in its statutory analysis but falls in line with Supreme Court precedent. As the Court stated in *Arizona v. Manypenny*, 451 U.S. 232, 243 (1981): "It goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government. Because the regulation of crime is pre-eminently a matter for the States, we have identified a strong judicial policy against federal interference with state criminal proceedings." (Cleaned up). The *Meadows* Court recognized this policy when it noted that federal courts "must retain the highest regard for a State's right to make and enforce its own criminal laws," and that "[t]he jurisdiction to try state offenses should not be wrested from [state] courts lightly." 88 F.4th at 1342–43. In short, this Court adopting the reasoning and rationale of *Meadows* – both as to the "federal officer"

24

and "working under" provisions of the removal statute – would be consistent with Supreme Court law and well-established principles of federalism and comity. And under *Meadows*, even if this Court were to find that Keely was a federal officer or working under one at the time of Sterling's death, he had already been stripped of that status by the time the State brought criminal charges against him or the time that Keely filed his notice of removal.[9]

However, this Court need not necessarily resolve the applicability of *Meadows* to rule in favor of the State because Keely was neither a federal officer nor working under a federal officer *at the time he killed Samuel Sterling*.

### B. Keely was not a federal officer at the time he killed Samuel Sterling

Here, Keely was not a "federal officer" at the time he killed Samuel Sterling. Rather, he was an officer of a *state* law enforcement agency with limited powers given to him as a Special Deputy U.S.

---

[9] Again, an evidentiary hearing would undoubtedly clarify Keely's status at the relevant times.

25

Marshal.  Indeed, at the relevant times, Keely continued to be subject to the terms and conditions of employment with the Michigan State Police.

28 U.S.C. § 1442 requires that the removing defendant be "any officer … of the United States or of any agency thereof[.]"  28 U.S.C. § 1442(a)(1).  § 1446, which is the definitions statute within Chapter 89 of Title 28, does not provide a definition of "federal officer."  *See* 28 U.S.C. § 1446.  However, the United States Code's general definitions section defines "officer" as "any person authorized by [federal] law to perform the duties of the office[.]" 1 U.S.C. §1.

One need go no further than the "Special Deputation Oath of Office, Authorization and Appointment" form in this case (12/6/23 Oath of Office, Case#1:24-cv-672, ECF#1-2, PageID.77) to see that Keely was not authorized by federal law to perform all the duties of the office of Deputy U.S. Marshal and no further than the 2018 MOU between the U.S. Marshals Service and the Michigan State Police (Defense Exhibit 2 at the evidentiary hearing conducted on August 21, 2024, admitted at 8/21/21 Tr., Case#1:24-cv-672, ECF#21, PageID.245, attached to this brief as Appendix A) to see that Keely at *all* times continued to be

26

subject to the terms and conditions of employment with the Michigan State Police.

Keely was not appointed to be a Deputy U.S. Marshal.  Instead, he was appointed to be a *Special* Deputy U.S. Marshal.  On the facts of this case, there is a difference between being a Deputy U.S. Marshal and being a *Special* Deputy U.S. Marshal.  Specifically, as a Special Deputy U.S. Marshal, Keely was not authorized by federal law to perform all the duties of the office of Deputy U.S. Marshal.  Rather, the Special Deputation form authorized Keely only to "to seek and execute arrest and search warrants supporting a federal TF [task force] under Title 18 authority." (12/6/23 Oath of Office, Case#1:24-cv-672, ECF#1-2, PageID.77.)  The form specifically states that Keely is "not authorized to participate in federal drug investigations unless deputized by DEA or FBI" and is "not valid off duty."  (*Id.*)  And the special deputation had an end date – December 31, 2026.  (*Id.*)  Such limitations are consequential.  *See and contrast Kleinert*, 855 F.3d at 312 ("Kleinert worked full-time for the FBI investigating federal crimes….  Nothing in the record indicates that this federal assignment was merely temporary or otherwise limited in scope.  Kleinert is therefore a federal officer for

27

purposes of removal.")  These factors are likewise dispositive on whether Keely is a "federal officer" in this case.  The scope of his special deputation was limited both in what he could do and for how long that designation lasted.  And he was not investigating federal crimes.  He was consequently not a "federal officer" at the time he killed Samual Sterling.

When this argument was made below, the district court said that the State "cites no authority requiring that an individual possess the authority to perform *all* the duties of a federal officer in order to qualify as a federal officer under the removal statute."  (8/26/24 Opinion, Case#1:24-cv-672, ECF#18, PageID.203.)  This misses the mark.  As noted above, 1 U.S.C. § 1 defines "officer" as "any person authorized by [federal] law to perform the duties of the office[.]"  It does not say, "any person authorized to perform *some of the* duties of the office."  The plain language of the statute should control when interpreting it.  *See Public Interest Legal Foundation v. Benson*, 136 F.4th 613, 625−26 (6th Cir. 2025).

Further, the district court's reliance on *Robinson v. Sauls*, 102 F.4th 1337 (11th Cir. 2024), is misplaced.  The State does not dispute

28

that Keely was appointed as a special deputy U.S. Marshal. Rather, the question is whether that appointment, in the context of the facts of this case, makes him a "federal officer" *for purposes of 28 U.S.C. § 1442(a)(1).* And *Robinson* does not – nor does it purport to – answer that question. In fact, *Robinson* is not a federal removal case at all. Rather, it addresses "whether a judicially crafted *Bivens*[10] cause of action is available for the claim alleging that Officers Heinze and Doyle [two task force participants] used excessive force in violation of [the plaintiff's] Fourth Amendment rights." *Robinson,* 102 F.4th at 1341.[11]

The Special Deputation form provides additional evidence that Keely was not a federal officer by making it clear that he was *not* to be considered a federal employee or an appointee to any position in the Federal Service. The Special Deputation form has a section entitled "Terms of Special Deputation", which is reproduced in part below:

> This appointment does not constitute employment by the
> United States Marshals Service, the United States

---

[10] *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1981).

[11] The district court also cited *Ohio v. Meade,* No. 2:21-cv-5587, 2022 WL 486294 (S.D. Ohio Feb. 17, 2022), in support of its decision to remove this matter. (8/26/24 Opinion, Case#1:24-cv-672, ECF#18, PageID.204.) The State contends that *Meade* is wrongly decided in light of other relevant caselaw.

Department of Justice, or the United States Government. The appointee agrees to perform the duties required under this Special Deputation with the knowledge that he or she is neither entering into an employment agreement with the Federal Government or any element thereof, nor being appointed to any position in the Federal Service by virtue of this Special Deputation.[12]

12/6/23 Oath of Office, Case#1:24-cv-672, ECF#1-2, PageID.77.

It is true that the phrases "federal employee" and "federal officer" are not identical or synonymous. But there is nonetheless a link.[13] As one federal trial court has held, a party moving for removal "must show that it effectively stands in the shoes of a *federal employee* and, as such, was required by the government to take actions that subjected it to liability under state law." *Vandeventer v. Guimond*¸ 494 F.Supp.2d 1255, 1264 (D.Kan. 2007) (cleaned up and emphasis added).

---

[12] Consistent with the Special Deputization form, defense witness Matthew Ortiz of the U.S. Marshals Service conceded at the evidentiary hearing on the federal officer question that Keely was not a U.S. Marshals Service employee. (8/21/24 Tr., Case # 1:24-cv-672, ECF#21, PageID.258−59.)

[13] When the State made the same assertion before the district court, the court said that the State had "acknowledged" that the terms "federal officer" and "federal employee" are not synonymous. (8/26/24 Opinion, Case #1:24-cv-672, ECF#18, PageID.203.) But the court did not note the State's caveat language (that there is a nonetheless a link between the two).

30

The 2018 MOU between the U.S. Marshals Service and the Michigan State Police provides further evidence that Keely was not a federal officer for purposes of removal.  Not only does the MOU expressly state that the Michigan State Police remains responsible for the conduct of its personnel, but it contains *no* provisions that would negate the duties and responsibilities normally associated with an employer-employee relationship.  It was the Michigan State Police who set the amount and nature of Keely's compensation and employee benefits.[14]  And perhaps most importantly, it was the Michigan State Police that retained the responsibility to set policies regarding Keely's conduct and to provide the procedure for disciplinary action to enforce

---

[14] During the evidentiary hearing held on the notice of removal, defense witness Ortiz conceded on cross-examination by the State that state members of the task force are paid by – and receive benefits (other than overtime costs when involved in federal operations) from – the agency they come from and are subject to discipline from their own agencies. (8/21/24 Tr., Case#1:24-cv-672, ECF#21, PageID.260, 265, 273.)  In addition, the state participants in the task force, while technically considered full time Special Deputy U.S. Marshals, could be asked by their state agencies at any time to fulfill a request for some kind of action unrelated to the task force.  (*Id.* at 275−76.)

31

such policies.[15]  For example, the MOU specifically provides in its "Use

of Force" section as follows:

> All members of [the task force] shall comply with their
> agencies' guidelines concerning the use of firearms, deadly
> force, and less-lethal devices.

(2018 MOU, Appendix A, p. 3 (emphasis added)).

In short, none of the criteria normally associated with an

employer-employee relationship are present between Keely and the U.S.

Marshals Service.  Even the district court conceded as much.  (8/26/24

Opinion, Case#1:24-cv-672, ECF#18, PageID.201, 202.)

For these reasons, the district court erred.  Keely was not a

"federal officer" under 28 U.S.C. § 1442(a)(1) at the time he killed

Samuel Sterling.

### C.   Keely was not acting "under" a federal officer at the time he killed Samuel Sterling

The district court also erred in finding that Keely was "acting

under" a federal officer at the time he killed Sterling.  This is because,

---

[15] In fact, Ortiz testified that the U.S. Marshals Service would not investigate – for example – a situation where a participant in the task force is involved in a shooting.  (8/21/24 Tr., Case#1:24-cv-672, ECF#21, PageID.267.)

even though the U.S. Marshals Service is clearly a federal agency, the mere fact that it was a participant in the joint federal/state task force does not satisfy the alternative requirement under 28 U.S.C. § 1442(a)(1) that Keely *be "acting under"* a federal officer. In construing this requirement, courts generally support the proposition that persons are "acting under" a federal officer for purposes of removal when the activities forming the basis of the suit against them were performed *pursuant to federal directive.* In other words, it has been articulated as a requirement that the activities be performed pursuant to a federal officer's direct orders and detailed regulations. As the Supreme Court has noted, the "acting under" relationship "typically involves subjection, guidance, or control," and "must involve an effort to *assist,* or to help *carry out*, the duties or tasks of the federal *superior.*" *Watson,* 551 U.S. at 151−52 (emphasis added). *See also Government of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 185 (1st Cir. 2024). Specifically, courts often look for a contract, delegation of legal authority, employer/employee relationship, or some other indicia of a principal/agent relationship between the federal officer and the private or state actor in determining whether the prong is fulfilled. *See Mays,*

33

871 F.3d at 444–45. In addition, the party "must be assisting the federal government in carrying out the government's *own* tasks in order to invoke federal-officer removal." *Id.*, at 444 (emphasis added). To determine whether that is so in a given case, courts may consider whether the party performs a role the federal government would otherwise need to perform but for the party's assistance. *See Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.*, 647 F.App'x 619, 623 (6th Cir. 2016). On the other hand, acts occurring under the *general* auspices of a federal officer are not sufficient to support removal. *Good v. Armstrong World Industries, Inc.*, 914 F. Supp. 1125, 1128 (E.D. Pa. 1996).

While the district court in its opinion granting removal uses broad strokes of the brush suggesting that it was the U.S. Marshals Service that was in full control of the operation that occurred on April 17, 2024, the facts elicited at the evidentiary hearing of August 21, 2024 demonstrate that it was wrong in making this assumption.[16] It was a

---

[16] Likewise, testimony by Ortiz (as well as his statement in his "declaration") that Keely, on April 17, 2024, was "under the direction, control, and supervision of the United States Marshals Service … subject to applicable policies and procedures of the U.S. Department of Justice and the United States Marshals Service" (8/5/24 Declaration of

34

*state* officer – Det./Sgt. Ross Eagan of the Wyoming Police Department – who created what appears to be the main operational plan[17] for the task force's operation that occurred on April 17, 2024, which involved executing a *state* warrant. While another member of the task force – identified as "Detective Nagtzaam" – *also* created an operational plan for the action, it is worth noting that he is *also* a state officer with the Grand Rapids Police Department, though acting on behalf of the U.S. Marshals in this operation.[18] (8/21/24 Tr., Case#1:24-cv-672, ECF#21, PageID.254–55, 272.) Even Ortiz was forced to concede that the operation was "run jointly with" state law enforcement. (*Id.* at PageID.272.)

In other words, the task force at issue was a *joint* and equal effort between state officers and federal officers with neither group exercising

Matthew Ortiz, Case#1:24-cv-672, ECF#11-1, PageID.183) is not supported by the significant evidence to the contrary presented at the August 21, 2024 evidentiary hearing.

[17] The state operational plan is part of the district court record. (4/17/24 MPACT/Wyoming Plan, Case#1:24-cv-672, ECF#10-4, PageID.161.)

[18] When asked by the district court which of the two operational plans "controlled" the operation on April 17, 2024, Ortiz said, "I wouldn't say there's one that's in control …." (8/21/24 Tr., Case#1:24-cv-672, ECF#21, PageID.276.)

full leadership control over the other. Moreover, it was clearly the task force's role in this case to assist state authorities in arresting a state defendant with outstanding state warrants, *not* to assist with the federal government's own tasks or to perform a role the federal government would otherwise need to perform but for the party's assistance.

One final point: Returning once again to the MOU, that document makes it clear that the Keely remained subject to the "use of force" policies of the Michigan State Police while he carried out his duties with the federal/state task force. In other words, Keely was not subject to the direct control of a federal officer but rather had to answer to his commanding state law enforcement agency – the Michigan State Police – for his conduct.

For these reasons, the district court erred. Keely was not "acting under" a federal officer under § 1142(a)(1) at the time he killed Samuel Sterling.[19]

---

[19] Because Keely was neither a federal officer or acting under one at the time state charges against him were brought, the time he filed his notice of removal, or at the time he killed Sterling, it is unnecessary for this Court to address whether Keely has met his burden as to the remaining prongs of the *Mesa* test – that he is being charged criminally

In short, the district court erred in removing this case under 28 U.S.C. § 1142(a)(1) and in denying the State's motion to remand. Reversal is warranted.

## II. The district court erred in finding that Keely was entitled to Supremacy Clause immunity where Keely was not authorized by the federal government to act in the manner he did and, in any event, because he did more than was necessary and proper in carrying out any duties

The Supreme Court has determined that, in light of the Supremacy Clause of the United States Constitution, (Article VI, Clause 2) federal officers enjoy immunity from state criminal prosecution in certain situations. *Cunningham v. Neagle*, 135 U.S. 1 (1890); *Tennessee v. Davis*, 100 U.S. 257 (1879).

This Court, relying on *Neagle*, extrapolated a two-part test to determine whether a state is divested of the power to prosecute a federal officer for a state crime or, in other words, whether a state defendant is entitled to Supremacy Clause immunity:

> [A] state … has no jurisdiction if (1) the federal agent was performing an act which he was authorized to do by the law of the United States and (2) in performing that authorized

---

"for or relating to any act under color of such office" and that he has demonstrated a "colorable federal defense."

37

act, the federal agent did no more than what was necessary and proper for him to do.

*Kentucky v. Long*, 837 F.2d 727, 744 (6th Cir. 1988) (citing *Neagle*, 135 U.S. at 75).[20]

*Long* lays out the process in this Circuit by which to analyze an assertion of Supremacy Clause immunity. When a criminal defendant seeks to invoke Supremacy Clause immunity, he must first establish "a threshold defense of federal immunity." *Long*, 837 F.2d at 752. If he does so, then the burden shifts to the prosecution to produce evidence "sufficient at least to raise a genuine factual issue whether the federal officer was acting pursuant to the laws of the United States and was doing no more than what was necessary and proper for him to do in the performance of his duties." *Id.*

---

[20] There is some question as to whether this Court in *Long* (as well other circuits in their own decisions, many of whom cite *Long*) correctly analyzed *Neagle* and its progeny in extrapolating this two-part test. *See* Mannheimer, Michael, *Unpacking Supremacy Clause Immunity* (June 06, 2025). Available at SSRN: https://ssrn.com/abstract=5283929 (last accessed on September 24, 2025). This will be the subject of an amicus to be filed in this appeal.

## A.    Authorized acts

There is a scarcity of caselaw interpreting the first prong of this test – whether the defendant "was acting pursuant to the laws of the United States."[21]  Nonetheless, courts have held that this means a showing that the officer was "performing authorized acts."  *Whitehead v. Senkowski*¸ 943 F.2d 230, 234 (2d Cir. 1991).  While this prong may facially seem easy to determine, "[t]here often exist disputes over the facts inherent in the determination of federal authorization of the acts in question …."  *Id.*  For example, a mere error in judgment is

---

[21] Contrary to what Keely argued below (and was apparently agreed to by the district court, *see* 4/21/25 Tr., Case#1:24-cr-115, ECF#103, PageID.1079−80), whether Keely was a federal officer or acting under one at the time of an incident for purposes of the removal decision is *not* the same question as whether Keely was performing an act that he was authorized by the United States to perform.  If that were the case, why would a discussion of the first *Long* prong *ever* be necessary?  In fact, why have such a prong at all if it is a given point in every state case that is removed to federal court?  *See, e.g.*, *Wyoming v. Livingston*, 443 F.3d at 1224−28 (addressing as separate questions whether a state court action was properly removed – e.g., whether the defendant was a "federal officer" – and whether the defendant/federal officer had authority for his acts under the laws of the United States); *see also* *Texas v. Kleinert*, 855 F.3d at 315 n.8 (recognizing that the questions might be separate but ultimately deciding that it would "not address whether the standards for satisfying the federal-officer element of removal under 28 U.S.C. § 1442 and the federal-officer element of Supremacy Clause immunity are materially distinct.")

39

insufficient to say that a defendant was acting outside the scope of his authority. *Baucom v. Martin*, 677 F.2d 1346, 1350 (11th Cir. 1982). However, if the State can demonstrate that the officer might have "acted because of any personal interest, *malice, actual criminal intent,* or for any other reason than to do his duty as he saw it," the officer could be deemed to have acted outside the scope of his general authority. *Id.* (emphasis added).

In this case, the State alleged that Keely committed both the offense of second-degree murder and the offense of involuntary manslaughter. Both offenses have elements of malice or other criminal intent.

The elements of second-degree murder under Michigan law are (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse. *People v. Werner*, 659 N.W.2d 688, 692 (Mich. Ct. App. 2002). "Malice" was further defined by the *Werner* court as follows:

> Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm. Malice may be inferred from evidence that the defendant intentionally set in motion a force likely to cause

40

death or great bodily harm.  The prosecution is not required to prove that the defendant actually intended to harm or kill.  Instead, the prosecution must prove the intent to do an act that is in obvious disregard of life-endangering consequences.

(*Id.,* cleaned up).

The elements of involuntary manslaughter under Michigan law are: (1) a death caused by the defendant, (2) without legal justification or excuse, (3) while the defendant was acting in a grossly negligent manner or while committing an unlawful act that was inherently dangerous to human life.  *In re Gillis*, 512 N.W.2d 79, 80 (Mich. Ct. App. 1994).  To prove the gross negligence element, the prosecution must establish: (1) defendant's knowledge of a situation requiring the use of ordinary care and diligence to avert injury to another, (2) his ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand, and (3) his failure to use care and diligence to avert the threatened danger when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another.  *People v. Albers*, 672 N.W.2d 336, 339 (Mich. Ct. App. 2003).  Thus, the criminal intent for this offense relates to acting in a grossly negligent

41

manner[22] or while committing an unlawful act that was inherently dangerous to human life.

In other words, for these two offenses, all that the prosecution has to do under Michigan law is prove malice in the form of the intent to do an act that is in obvious disregard of life-endangering consequences (for the second-degree murder charge) and/or that the defendant acted with gross negligence (for the involuntary manslaughter charge).  It did so here through the three video clips admitted by stipulation at the evidentiary hearing on the immunity question (and which were referenced by the district court in its opinion granting immunity to Keely).[23]

The videos provide shocking – and very disturbing evidence – that Keely acted with malice and/or that he was grossly negligent as those

---

[22] In Michigan law, "gross negligence" is "equivalent to a criminal intent." *People v. Datema*, 533 N.W.2d 272, 280 (Mich. 1995) (internal citation omitted).

[23] State's exhibits 2, 3, and 14, were admitted into evidence at the immunity hearing by stipulation. (4/21/25 Tr., Case#1:24-cr-115, ECF#103, PageID.1114–15.)  These three videos exhibits were earlier in the case provided on thumb drives to the Clerk of the District Court, the district court judge's chambers, as well as to opposing counsel. (11/22/24 Letter and Thumb Drive, Case#1:24-cr-115, ECF#44, PageID.471–72.)  Upon request, the State can provide additional copies of these video exhibits directly to the Clerk of this Court.

terms or phrases are defined above. In particular, the "Ellis" body cam video (State's Exhibit 3) demonstrates that Keely drove his vehicle in such a manner (and up onto the sidewalk/curb along the wall of the Burger King restaurant) that he ended up pinning Samuel Sterling up against the brick wall of the restaurant thereby severely injuring him (said injuries having led to Keely's death).[24] What follows are three

---

[24] The district court viewed the videos introduced into evidence at the evidentiary hearing on the immunity question and still ended up finding that "the relevant facts here are not disputed." (Opinion, Case#1:24-cr-115, ECF#109, PageID.1575.) But Keely and the State could not have more diametrically opposed views of what occurred in those videos. The videos largely speak for themselves but suffice it to say that they display an extremely troubling set of actions, none of which were necessary. The State asks this Court to examine those videos carefully and make its own determination de novo (as that is the standard of review for this claim) as to what they demonstrate.

43

screenshots from those videos.  The first is a screenshot from State's

Exhibit 2 (the "Burger King" video):



The second is a screenshot from State's Exhibit 3 (the "Ellis" video):



The third is a screenshot from State's Exhibit 14 (the "Eagan" video):

44



What's illustrated by these three screenshots is the fact that Keely went up onto the sidewalk/curb with his vehicle and violently pinned Sterling to the wall of the Burger King, significantly short of the entry door to the restaurant, which Keely purportedly was aiming for.

Significantly, this video evidence was compelling enough to convince a state district court judge that the State had established probably cause as to the elements of second-degree murder (including "malice") and involuntary manslaughter (including "gross negligence"). (*See* 8/22/24 Prelim. Exam. Tr., Case#1:24-cr-115, ECF#39, PageID.383-86.)[25]  It should have been equally compelling to the federal district judge.

---

[25] Among the comments made by the state district court at the time of bindover to the state circuit court:  "[T]he angle of approach [of Keely's vehicle] can be observed in the videos as almost parallel and directly behind the fleeing decedent such that one could infer that the defendant

But, the district court, faced with this strong evidence of criminal intent (either malice or gross negligence) as demonstrated through the video evidence, dismissed the State's arguments on this point, finding that, "[i]n effect, the State is arguing that if Keely violated Michigan criminal law, he is not entitled to immunity." (5/28/25 Opinion, Case#1:24-cr-115, ECF#109, PageID.1573.)  This is an oversimplification of the State's position.  This is because it makes no sense that a defendant can harbor criminal intent in committing an act and still be found to have been performing authorized acts.

In sum, because the State has shown, particularly through the video evidence, that Keely acted with malice (with respect to the second-degree murder charge) and gross negligence (with respect to the involuntary manslaughter charge), this Court should find that there is at least a genuine factual question as to whether Keely's actions were outside the scope of his general authority and thus that the district erred in ruling otherwise.  In other words, the State has shown that Keely's actions were no mere "error in judgment."  Because of this, the

---

knew his vehicle could not in advance in front of the suspect to block his flight without making contact." (8/22/24 Prelim. Exam. Tr., Case#1:24-cr-115, ECF#39, PageID.384-85.)

46

State had demonstrated that, at the time Samuel Sterling was killed, Keely was not "performing an act which he was authorized to do by the law of the United States."

## B.    Necessary and proper

If this Court does not agree with the State on the "authorized act" prong of *Long*, Keely still loses as the State met its burden of producing evidence at the evidentiary hearing on the immunity question "sufficient at least to raise a genuine factual issue whether the federal officer … was doing no more than what was necessary and proper for him to do in the performance of his duties." *Long*, 837 F.2d at 752.  A court must "view the evidence in the light most favorable to the State and assume the truth of the allegations in the indictment." *New York v. Tanella*, 374 F.3d 141, 148 (2d Cir. 2004).  When assessing whether the defendant's actions were "necessary and proper," this Court must apply both a subjective and objective standard.  *Long*, 837 F.2d at 745.  The court must determine whether the defendant subjectively believed that his actions were authorized.[26]  Then, the court must analyze whether

---

[26] The only real evidence of Keely's subjective beliefs was references to his statement following the incident.  Whether that was sufficient in this case to establish Keely's subjective beliefs is a question this Court

the federal officer's subjective belief was objectively reasonable under the circumstances.  *Id.* at 744.

Pursuant to *Long*, once the defendant has raised a threshold defense of Supremacy Clause immunity, "the state cannot overcome that defense merely by way of allegations.  Rather, the state at that point must come forward with an evidentiary showing sufficient at least to raise a *genuine* factual issue whether the federal officer was doing no more than what was necessary and proper for him to do in the performance of his duties."  *Id.* at 752.

Much can be gleaned by examining qualified immunity claims in police brutality cases where the same standard ["objectively reasonable"] applies.  *See LaLonde v. County of Riverside,* 204 F.3d 947, 959 (9th Cir. 2000) ("Under the Fourth Amendment, police may use only such force as is objectively reasonable under the circumstances." (citing *Graham v. Connor,* 490 U.S. 386, 397 (1989))).  As noted in *Idaho v. Horiuchi*, 215 F.3d 986, 1003 (9th Cir. 2000),[27] "[t]he identity of

need not resolve, as any subjective belief by Keely as reflected in his statement is so clearly objectively unreasonable.

[27] Ultimately, in an opinion written by Judge Kozinski (the dissenter in the original panel case), an en banc panel of the Ninth Circuit reversed the panel's decision holding that material questions of fact existed as to

48

language is no coincidence; it reflects the fact that the question, in both types of cases, is exactly the same:  Did the agent's conduct violate the Constitution?"

Here, the evidence and testimony produced at the evidentiary hearing on the immunity question demonstrates – at the very least – that there is a "genuine factual issue whether the federal officer . . . was doing no more than what was necessary and proper for him to do in the performance of his duties."  Keely's motion to dismiss should have been denied.

There were two experts on the use of force called to the stand at the evidentiary hearing – Paul Massock (Keely's witness), and Dr. Mark Brown (the State's witness).[28]  This Court need not determine which of

---

whether a federal officer acted reasonably.  *Idaho v. Horiuchi*, 253 F.3d 359 (9th Cir. 2001) (en banc), vacated as moot, 266 F.3d 979 (9th Cir. 2001).

[28] The State contends that the bulk of (defense witness) accident reconstructionist Thomas Langley's testimony – which largely centered on the issue of whether Keely *intentionally* drove into Sterling – is irrelevant as, as noted at the evidentiary hearing, the State was not contending that Keely *intentionally* struck Sterling.  (4/21/25 Tr., Case#1:24-cr-115, ECF#103, PageID.1208, 1210.)  Rather, for second-degree murder the intent can be merely to do an act that is in obvious disregard of life-endangering consequences and for involuntary manslaughter only "gross negligence" must be shown.  *See* discussion, *supra.*  In any event, Langley's credibility was severely damaged by his

these experts provided the most credible or compelling testimony.[29] All

it needs to do is determine whether any clash in opinions between these

experts raises a "genuine factual issue" as to whether Keely was doing

more than was necessary and proper in the performance of his duties.

During his testimony, Dr. Brown rendered the following opinions

among others:

- Brown opined that "deadly force"[30] in this case "wasn't justified based on the totality of the circumstances, and

confusing and contradictory explanation for the last second 170 degree turn to the right (recorded by the vehicle itself) just before Sterling was struck (*see, e.g., id.* at PageID.1190−91) and for claiming that *Sterling struck Keely's vehicle*, not the other way around (*Id.* at PageID.1151, 1155−56, 1162, 1165, 1192.)  As such, the only dispute of significance before the district court (and this Court) is that between witnesses Massock and Brown.

[29] That is not to say that the State does not have its issues with Massock's testimony.  There are portions of his testimony that are not persuasive since they are based solely on Keely's self-serving statement to the police.  (*See, e.g.*, 4/21/25 Tr., Case#1:24-cr-115, ECF#103, Page.ID.1267.)  Moreover, portions of Massock's testimony actually assist the State's position, including his concession that he could not "ascertain" Keely's intent in turning his vehicle towards Sterling when asked on cross-examination by the State if he considered it a high risk of death or great bodily harm to do so.  (*Id.* at PageID.1269−70, 1274.)

[30] In his report, Dr. Brown indicated that "[a] deadly force encounter occurs when an officer uses force that it likely to or does result in serious bodily injury or death of another person." (State's Exhibit 5, at the evidentiary hearing conducted on April 21, 2025, admitted at 4/21/25 Tr., Case#24-cr-115, ECF#103, PageID.1302, attached to this brief as Appendix B, p. 11.) He added that Keely "striking Mr. Sterling with his vehicle is deadly force regardless of whether the collision was

50

that the tactics used prior to the impact at the Burger King were inconsistent with generally accepted principles and practices." (4/21/25 Tr., Case#1:24-cr-115, ECF#103, PageID.1311.)

- Brown opined that an officer in a vehicle trying to get on a curb to block someone's path or to reroute them in another direction is inconsistent with generally accepted principles and practices because the driver has to get ahead of the fleeing person, get onto the curb, stop, and then hopefully reroute the fleeing person. (*Id.* at PageID.1313.) Brown also expressed a concern that doing so would get close to the restaurant door, a problem because someone could be coming out of that door at that moment. (*Id.*)

- Brown's review of the documents, reports, and videos did not reveal anything to him which would indicate that Sterling had a weapon on April 17, 2024. (*Id.* at PageID.1314.) And whether Sterling had a weapon, while playing some role, would not be the only factor at issue. (*Id.* at PageID.1314-15.)

Dr. Brown elaborated on these points in his written report, which

was admitted into evidence:

It is a generally accepted principle and practice that vehicles can be used during foot pursuits to provide officers with the ability to follow a suspect running without having to run and potentially becoming fatigued. Vehicles can be used to block streets and potentially force fleeing suspects to

---

intentional." (*Id.* at p. 18.) This is in contrast to Massock's testimony which did not characterize what Keely did as "deadly force." (4/21/25 Tr., Case#1:24-cr-115, ECF#103, PageID.1277.) This divergence in opinion—revealing a "genuine factual issue"—is yet another reason why the district court should have denied Keely's motion to dismiss.

slow down to change their direction of travel.  However, it is not consistent with generally accepted principles ... to attempt to block the door of a building.  The door of the Burger King restaurant is offset from the curb, Sgt. Keely was also driving against the traffic pattern of the [B]urger King restaurant.

Furthermore, this action could have injured non-involved pedestrians that may have chosen to exit from the restaurant by potentially slamming a door shut as they were exiting.  Mr. Sterling was fleeing from officers and appeared to be slowing down.  If he had entered the restaurant there were at least two officers that arrived at the location and had the opportunity to enter the restaurant and arrest Mr. Sterling.

(State's Exhibit 5, at the evidentiary hearing conducted on April 21, 2025, attached to this brief as Appendix B, pp. 17-18.)

In his report, Dr. Brown also addressed standards for the use of force promulgated by Michigan State Police (which Keely was bound to follow) and applied them to the facts of this case:

The MSP Order 05-01 (Subject Control and Use of Force) Section B states that the "Reasonableness will be determined by balancing the nature and quality of intrusions with the countervailing governmental interest. The question is whether the law enforcement officer's actions are reasonable considering the facts and circumstances confronting the officer.  Objective factors will determine the reasonableness of force, including but not limited to, the severity of the crime, whether the suspect poses an immediate threat to the safety of law enforcement or others, and whether the suspect is actively resisting arrest or attempting to evade by flight."  Mr. Sterling was evading the

52

officers by flight and there was no indication that he was armed with any weapons, which was confirmed after he was arrested and searched.  Mr. Sterling did not discharge a firearm or brandish any weapons while he was running away from the officers.  There was no indication based on intelligence or during the encounter that he was likely to enter the Burger King restaurant and harm the patrons/employees or hold anyone hostage.  Based on the BWC review, Mr. Sterling was slowing down.

It is a generally accepted principle and practice that vehicles can be used to block other vehicles from passing through roadways or be used to obstruct roadways depending on restrictions of agency policies.  However, using a vehicle to block the sidewalk/doorway from a fleeing suspect is inconsistent with generally accepted principles and practices.  Motorized vehicles are not as easily manipulated as smaller means of transportation such as bicycles.  Furthermore, there were other officers at the incident location which would have increased the likelihood of Mr. Sterling being taken into custody.

(*Id.* at pp. 18–19.)

As such, based on Dr. Brown's testimony alone, there is at least a question as to whether Keely did no more than what was necessary and proper when he struck Sterling with his vehicle.  It was nearly lunchtime at the time of the chase,[31] likely the busiest time for a fast-food restaurant like Burger King.  It is fortunate that no one was exiting the Burger King restaurant through the door at issue when

---

[31] *See* 4/21/25 Tr., Case#1:24-cv-115, ECF#103, PageID.1233.)

Keely was purportedly aiming directly for it with his SUV. Moreover, it is likewise fortunate that there was no collision between Keely's vehicle and any vehicles in the drive thru lane (Keely was driving his SUV in the opposite direction of vehicles proceeding through the drive-thru lane and could have potentially struck any vehicles in that lane).[32] And all of this to apprehend a fleeing individual who none of the officers had seen with a gun or other weapon in any of their observations earlier that day.[33]

And Keely's purported subjective belief that Sterling was going to enter the Burger King restaurant and cause further problems was not objectively reasonable. During his flight from the police, Sterling ran past at least one business without entering it and as well as running past multiple vehicles with occupants without menacing them. (4/21/25

---

[32] The third screenshot depicted above reveals that there was indeed a white vehicle in the drive-thru lane.

[33] Without knowing *for certain* that Sterling was armed (it turns out he was not), it was not objectively reasonable for Keely to believe that he would enter the Burger King restaurant and take hostages or otherwise menace any of the restaurant visitors or employees in order to evade capture. Moreover, it was not reasonable to believe that Sterling was in fact running alongside the Burger King restaurant in order to enter it. One would think that Sterling, in his attempt to flee, would attempt to go where there were no others present who could possibly assist the police in apprehending him.

Tr., Case#1:24-cr-115, ECF#103, PageID.1310−11, referencing the "Kum & Go" video.)

In fact, Keely's actions were so objectively unreasonable that, as per the discussion above, Keely was acting with malice or other criminal intent (gross negligence).  The existence of malice or other criminal intent *also* matters when determining whether, objectively speaking, a defendant's actions were "necessary and proper."[34]  *See Clifton v. Cox,* 549 F.2d 722, 728 (9th Cir. 1977).

Further assistance can be found in other caselaw, specifically as it relates to use of a vehicle leading to a death.  In *North Carolina v. Cisneros*, 947 F.2d 1135 (4th Cir. 1991), a marine driving in a convoy ran a red light and crashed into a civilian's vehicle, killing the civilian.

---

[34] Keely has tried to paint Sterling as a very dangerous individual that had to be apprehended by just about any means.  The whole point of Lieutenant Charles Christensen's testimony at the evidentiary hearing on the immunity question (4/21/25 Tr., Case#1:24-cr-115, ECF#103, PageID.1341−65) however, was to demonstrate that any failure to apprehend Sterling was not going to result in harm (or potential harm) to either police officers or the general public.  Yes, Sterling had a criminal history, but it was hardly the type of criminal history that necessitated the kind of action which ultimately resulted in his death.  Dr. Brown also testified that, while it would have been "bad" for Sterling to have escaped apprehension, "there would have been contingency plans in place to deal with that."  (4/21/25 Tr., Case#1:24-cr-115, ECF#103, PageID.1316.)

The State of North Carolina brought a charge of unintentional death by vehicle, among several others, against the defendant. The case was removed to federal court based on the defendant's on-duty status at the time of the incident and ultimately dismissed based on Supremacy Clause immunity. The Fourth Circuit *reversed* finding that in order to establish a federal immunity defense for an on-duty vehicular traffic incident, "a federal officer must show that the accident resulted from an exigency or emergency related to his federal duties which dictated or constrained the way in which he was required to, or could, carry out those duties." *Id.* at 1139.

This case reveals a situation far more concerning than any of the circumstances noted in *Cisneros*. It is certainly a fair inference from the video evidence that Keely turned the SUV he was driving in the general direction of Sterling in his direction. The video evidence shows that Keely hit Sterling with his vehicle and then pinned him against the wall of the Burger King restaurant with the vehicle. And, as was established at the evidentiary hearing, there was *no* exigency or emergency necessitating the use of deadly force to stop and apprehend Sterling. Keely's actions were objectively unreasonable.

56

* * *

In the end, Supremacy Clause immunity is not absolute. "Federal officers and employees are not, merely because they are such, granted immunity from prosecution in state courts for crimes against state law." *Colorado v. Symes*, 286 U.S. 510, 518 (1932).

There was evidence to at least raise a genuine factual question as to whether Keely's actions were done with malice and other criminal intent, thereby taking them out of the realm of protected "authorized acts" under Supremacy Clause immunity. For many of these same reasons (and more), Keely actions were far from "necessary and proper." Even if Keely subjectively believed that his actions were necessary, they were not an objectively reasonable way of dealing with the circumstances at hand. Keely's actions not only put Sterling at risk of death or very serious physical harm (and *in fact* led to his death), but it was nothing short of a miracle that others were not hurt by Keely's unreasonable and unjustified actions.

57

## CONCLUSION AND RELIEF REQUESTED

The State of Michigan respectfully requests that this Court reverse the decisions of the district court ordering removal of this case, denying the State's motion to remand, granting Supremacy Clause immunity to Keely, and dismissing the charges against him.  In the alternative, the State requests that this Court remand this matter to the district court for a further evidentiary hearing on Keely's status at the time state criminal charges were brought against him or when he first sought removal.

Respectfully submitted,

Dana Nessel
Attorney General

/s/ John S. Pallas
Assistant Attorney General
Co-Counsel of Record
Attorneys for Plaintiff-Appellant
Department of the Michigan
Attorney General
Criminal Appellate and Parole
Appeals Division
525 W. Ottawa St.
P.O. Box 30217
Lansing, MI 48909
(517) 335-7650
pallasj@michigan.gov

Dated: September 30, 2025

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the part of the document exempted by Federal Rule of Appellate Procedure 32(f), this brief contains no more than 13,000 words.  This document contains 12,237 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 2013 in 14-point Century Schoolbook.

<u>/s/ John S. Pallas</u>
Assistant Attorney General
Co-Counsel of Record
Attorneys for Plaintiff-Appellant
Department of the Michigan
Attorney General
Criminal Appellate and Parole
Appeals Division
525 W. Ottawa St.
P.O. Box 30217
Lansing, MI 48909
(517) 335-7650
pallasj@michigan.gov

## CERTIFICATE OF SERVICE

I certify that on September 30, 2025, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record (designated below).

/s/ John S. Pallas
Assistant Attorney General
Co-Counsel of Record
Attorneys for Plaintiff-Appellant
Department of the Michigan
Attorney General
Criminal Appellate and Parole
Appeals Division
525 W. Ottawa St.
P.O. Box 30217
Lansing, MI 48909
(517) 335-7650
pallasj@michigan.gov

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Plaintiff-Appellant, per Sixth Circuit Rule 28(a), 28(a)(1)-(2),

30(b), hereby designated the following portions of the record on appeal:

| Docket #: 1:24-cv-00672 | | | |
|---|---|---|---|
| Description of Entry | Date | Record Entry No. | Page ID No. Range |
| Notice of Removal of Criminal Action | 06/28/2024 | R. 1 | 1-21 |
| Response to Notice, Exhibit C - MPACT/Wyoming ID Operations Plan | 07/29/2024 | R. 10-4 | 161 |
| Reply to Response, Exhibit A | 08/05/2024 | R. 11-1 | 183 |
| Order | 08/06/2024 | R. 12 | 185-186 |
| Opinion | 08/26/2024 | R. 18 | 196-97, 201-05, 209 |
| Notice Regarding Reassignment | 08/27/2024 | R. 20 | 211 |
| Transcript of Evidentiary Hearing dated August 21, 2024 | 09/18/2024 | R. 21 | 212-334 |

| Docket #: 1:24-cr-00115 | | | |
|---|---|---|---|
| Description of Entry | Date | Record Entry No. | Page ID No. Range |
| Motion to Remand | 09/10/2024 | R. 8 | 16-31 |
| Motion to Remand, Exhibit A - Complaint and Warrant | 09/10/2024 | R. 8-2 | 34 |
| Amended Exhibit | 10/08/2024 | R. 30 | 161 |
| Motion for Evidentiary Hearing | 10/17/2024 | R. 33 | 165-71 |
| Motion to Dismiss | 10/29/2024 | R. 36 | 181-82 |
| Memorandum in Support of Motion to Dismiss | 10/29/2024 | R. 36-1 | 186-200 |
| Notice of Hearing on Motion | 11/12/2024 | R. 37 | 209 |
| Transcript of Preliminary Exam, Volume I | 11/14/2024 | R. 38 | 210-378 |
| Transcript of Preliminary Exam, Volume II | 11/14/2024 | R. 39 | 383-86 |
| Response in Opposition | 11/22/2024 | R. 43 | 438-68 |
| Exhibit -Letter and Thumb Drive | 11/27/2024 | R. 44 | 471-72 |
| Notice Cancelling Hearing | 12/02/2024 | R. 45 | 473 |
| Opinion | 12/11/2024 | R. 51 | 494-502 |
| Notice of Hearing | 02/25/2025 | R. 62 | 541 |
| Transcript of Evidentiary Hearing, Day I | 04/29/2025 | R. 103 | 1077-1381 |

62

| Transcript of Evidentiary Hearing, Day II | 04/29/2025 | R. 104 | 1392-1441, 1443 |
|---|---|---|---|
| Opinion | 5/28/2025 | R. 109 | 1564-82 |
| Order | 5/28/2025 | R. 110 | 1583 |
| Judgment | 05/28/2025 | R. 111 | 1584 |
| Notice of Appeal | 06/23/2025 | R. 112 | 1585 |